AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

4/14/20

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>information associated with ST4643196@GMAIL.COM<br>that is stored at premises controlled by Google | Case No. 3:20-mj-177<br><br>Magistrate Judge Michael J. Newman |

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Northern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment C | See Attachment C |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT OF BRIAN TURK

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brian Turk, SA of the HSI

Sworn to before me and signed in my presence via facetime.

Date: 1:32 PM, Apr 14, 2020

_____
Michael J. Newman
United States Magistrate Judge
*Judge's signature*

City and state: Dayton, Ohio

Michael J. Newman, US Magistrate Judge
*Printed name and title*

Via electronic means.

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Brian Turk, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Google, an email provider headquartered at 1600 Amphitheater Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent with Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge field office in Cincinnati, Ohio. I have been so employed since November 2011. As part of my daily duties as an HSI agent, I investigate criminal violations relating to Laundering of Monetary Instruments, Title 18 United States Code (U.S.C) § 1956, Unlawful Employment of Aliens, Title 8 U.S.C § 1324(a), Aggravated Identity Theft, Title 18 USC § 1028A, Harboring Illegal Aliens, 8 USC 1324(a)(1)(A)(iii) and 8 USC 1324(a)(1)(A)(iv), Encouraging and inducing illegal aliens to enter and reside in the U.S. I have received training and experience with enforcing immigration laws of the U.S., and I have also participated in investigations involving court-authorized interception of electronic communications.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (conspiracy to harbor aliens and to encourage and induce illegal aliens to enter and reside in the United States); 8 U.S.C. § 1324(a)(3) (during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens); 18 U.S.C. § 1028A (aggravated identify theft during and in relation to a violation of the Immigration and Nationality Act, 8 U.S.C. § 1321 *et seq.*); 18 U.S.C. § 1956(h) (conspiracy to commit money laundering). There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States (including a magistrate judge) . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. Based on a review of publicly available records, HSI has learned that Ignacio CHAVEZ-CASTILLO owns and operates several U.S.-based businesses, including ALL STEEL CARPORTS, INC. (hereinafter "ALL STEEL"). According to this company's public website, ALL STEEL operates from Muncie, Indiana and provides services relating to the manufacture and installation of steel carports, garages, and sheds in multiple states, including Ohio. A review of

immigration records has revealed that CHAVEZ-CASTILLO is a citizen and national of Mexico lawfully residing in the United States.

7. During fall 2019 and throughout 2020, HSI received information from an employee of ALL STEEL concerning historical as well as ongoing illegal activities at the company. This employee (hereinafter referred to as "CI") previously has provided HSI with information that led to the seizure of assets as well as criminal charges in another investigation. HSI deems the CI trustworthy and reliable. Additionally, HSI has corroborated information that the CI has provided, further confirming the CI's reliability. Over that time, the CI provided the following information to HSI:

a. Through the CI's work at ALL STEEL, the CI concluded that ALL STEEL, including CHAVEZ-CASTILLO, was inducing illegal aliens to travel from Mexico into the United States to provide the company with illegal laborers; ALL STEEL then knowingly paid these illegal aliens grossly reduced wages for completing construction projects in the United States, including Ohio. CHAVEZ-CASTILLO then concealed the profits that he generated from these illegal activities through real estate investments and transferring funds abroad.

b. For instance, according to the CI, the United States Treasury Department raised concerns in 2018 over a series of tax documents connected to ALL STEEL or its subcontractors. Specifically, the Treasury Department flagged over thirty W-2s and 1099 tax forms issued by ALL STEEL in which the name of the individual to whom the form was issued did not match his social security number. Based on my training and experience, I know that businesses that knowingly employee illegal aliens frequently issue tax forms to them using misappropriated social security numbers; businesses engage in this activity to conceal their knowing use of illegal laborers.

3

c.  The CI explained that CHAVEZ-CASTILLO owns metal production factories in Texas, California, and Indiana, which supply the materials for the construction of ALL STEELS carports. According to the CI, CHAVEZ-CASTILLO's factories are staffed by illegal aliens. The CI indicated that the illegal aliens manning the Texas factory also live in a part of that factory equipped with beds and showers.

d.  The CI indicated that an ALL STEEL employee in Mexico – Santiago TORRES-Ibarra – helps recruit people in that country to work illegally for ALL STEEL in the United States. The CI understood that TORRES, through a company called Grupo Telecomunicado, conducted "marketing" in Mexico, allegedly recruiting illegal alien labor for ALL STEEL. The CI stated that an ALL STEEL employee previously told the CI that TORRES had a prior arrest for some type of smuggling violation.

i.  The CI advised that CHAVEZ-CASTILLO used a Chase bank account in the name of ALL-AMERICAN BUILDINGS & CARPORTS, LLC., 2200 N GRANVILLE AVE., MUNCIE IN 47303 to make payments to TORRES and other individuals in Mexico. The CI stated that CHAVEZ-CASTILLO previously used his personal bank account to send payments to Grupo Telecomunicado but stopped that practice in or around February 2018.

ii.  Through the CI's work at ALL STEEL, the CI came across records relating to the transfer of funds from the ALL-AMERICAN Chase account to TORRES/Grupo Telecomunicado during early 2020. The CI voluntarily provided HSI with a copy of a wire transfer in the amount of $540.02 or $10,000 Mexican pesos conducted on or about January 16, 2020, with a listed wire recipient of: Grupo Telecomunicado SA De CV, Constituyentes 206 212 214 Fracc, El Jacal, Queretaro, Santiago De Queretaro, Mexico. In a similar fashion, the CI provided an example of a completed Chase wire in the amount of $4,225 on or about January 15, 2020, to

4

Manpower, S.A. De C.V., located in Cuidad de Mexico, Mexico. Attached to the Chase wire statement was a statement by Manpower indicating Grupo Telecomunicado conducted temporary worker payroll administration from 1/1/2020 to 1/15/2020 and was owed $79,482.14 pesos. Through an open source query, I learned that Manpower is listed as an employment agency in Mexico.

        iii.      The CI also noticed financial records indicating that, on several occasions, CHAVEZ-CASTILLO deducted fees from the wages that he paid to illegal alien members of the subcontractor work crews installing the carports. Based on my training and experience, I know that businesses that illegally bring alien workers into the United States often charge the workers for transportation or smuggling fees into this country.

    e.    The CI also explained that ALL STEEL is a cash intensive business. The CI indicated that, on an almost daily basis, subcontractors and labors of ALL STEEL bring cash to the business; the subcontractors and labors – many of whom are illegal aliens -- collected this cash from ALL STEEL customers who paid for the assembly of a steel building. The CI collected the cash and recorded the amount of cash received in a ledger. The CI then gave the cash to CHAVEZ-CASTILLO, who kept the money in a safe in his office. The CI advised that CHAVEZ-CASTILLO typically only deposited a portion of this cash into a bank account and kept the remaining profits for an unknown purpose. The CI advised that cash payments given to CHAVEZ-CASTILLO totaling at least $1,000,000 were not reported to any state entity or the federal government as income earned by either ALL STEEL or CHAVEZ-CASTILLO. The CI stated that ALL STEEL only reported a portion of its income and sales to taxing authorities. The CI indicated that ALL STEEL continually increased sales year-over-year because of the unfair competitive advantage the company has through its expansive use of illegal alien laborers and its

5

cash intensive business. During January 2020, the CI voluntarily showed a portion of this money ledger to HSI, confirming the disparity between cash arriving at ALL STEEL and the amount of cash actually deposited into ALL STEEL accounts.

8. HSI has reviewed immigration records and confirmed multiple instances in which aliens illegally in the United States have indicated that they worked for ALL STEEL. An incident involving an illegal alien named Antonio CORTES-Santos that occurred during early 2020 confirms the CI's representations that ALL STEEL knowingly uses illegal aliens to perform work throughout the United States, including southern Ohio. Specifically:

    a. On or about January 27, 2020, ICE officials had an interaction with CORTES in northern Ohio. During this encounter, CORTES confirmed that he was an illegal alien – namely, a citizen of Mexico who had illegally entered this country during the 2010s. ICE had no records indicating that CORTES had permission to lawfully work in the United States. CORTES claimed that he lived in Muncie, Indiana (the location of ALL STEEL) and worked for an Osteo Car Parts. I have performed a public records search and could find no information concerning an Osteo Car Parts operating in Muncie, Indiana. ICE detained CORTES pending removal proceedings, but he was granted a $30,000 bond, which was posted shortly after his encounter with ICE.

    b. During February 2020, the CI confirmed that CORTES worked for ALL STEEL and that the CI believed that the company had assisted him to obtain a bond from immigration authorities. Specifically, around this time, ALL STEEL Vice President, Michael BURTON told the CI not to worry about CORTES' bond because it had been taken care of. During February 2020, CORTES reported to ALL STEEL's offices for work following his release from ICE custody. CHAVEZ-CASTILLO instructed the CI to write CORTES a check for $10,000,

6

drawn from an ALL STEEL Chase account. According to the CI, CHAVEZ-CASTILLO signed the $10,000 check and gave CORTES $20,000 in currency.

  c. CORTES continued to work for ALL STEEL at various jobsites in Indiana and Ohio during late February and March 2020. ALL STEEL management advised the CI that it was safe to send CORTES back to work mainly in Ohio because CORTES has already been arrested by immigration officials and could not be arrested again. Notably, I conducted surveillance in southern Ohio during March 2020 and observed CORTES installing metal buildings here.

  9. Financial records revealed that, in January 2019, CHAVEZ-Castillo sent an electronic wire of $1.9 million in U.S. currency from his personal account to Mexico, to allegedly purchase or construct a high-rise building. Additionally, CHAVEZ-Castillo owns several real estate properties in the U.S. the combined value of which is over $7 million. Based on information from the CI, a review of financial records, and ALL STEEL's use of illegal laborers in the United States, I believe that these purchases have been funded in large part with the profits of CHAVEZ-CASTILLO's illegal activities described above.

  10. On March 5, 2020, I conducted Immigration and Customs Enforcement (ICE) database queries for information regarding Santiago TORRES-Ibarra. Query results revealed the following information for concerning TORRES:

  a. TORRES claims to be a native and citizen of Mexico by virtue of birth, who was born in Acambaro, Queretaro, Mexico on November 2, 1971. CI information indicated TORRES and CHAVEZ-CASTILLO grew up together in Queretaro, Mexico.

  b. Santiago TORRES-Ibarra was encountered on January 23, 2019 by ICE officers assigned to Enforcement and Removal Operations (ERO)-Raleigh, NC at the completion

7

of his prison sentence with the North Carolina Department of Corrections at Caswell Correctional located at Yanceyville, NC. Due to an active detainer lodged by a Special Agent with ICE HSI on June 17, 2003, TORRES transferred into ICE custody at the Cary, NC sub-office for processing. TORRES was a lawful permanent resident who appeared to be subject to removal proceedings based in his felony drug convictions, including: On August 16, 2001, TORRES was convicted in the Guilford County Superior Court at Greensboro, North Carolina, under state docket number 99CRS082537, for the offense of TRAFFICKING IN COCAINE BY TRANSPORTING, in violation of N.C.G.S. 90-95 (H)(3); on August 16, 2001, convicted in the Guilford County Superior Court at Greensboro, North Carolina, under state docket number 99CRS082538, for the offense of TRAFFICKING IN COCAINE BY POSSESSION, in violation of N.C.G.S. 90-95 (H)(3); and on March 20, 2002, TORRES was convicted in the Guilford County Superior Court at Greensboro, North Carolina, under state docket number 99CRS097663, for the offense of CONSPIRE TO TRAFFIC COCAINE BY POSSESSION 400 GRAMS OF MORE, in violation of N.C.G.S. 90-95(I).

11. In April 2020, I reviewed Chase records for ALL-AMERICAN. These records indicated a $200,000 transfer from the ALL-AMERICAN Chase account to Grupo Telecomunicado Sa DE Cv on March 16, 2020 and a $2,800 transfer to TORRES on March 31, 2020.

12. On April 9, 2020, the CI voluntarily provided HSI Special Agents with copies of email correspondence regarding Santiago TORRES from email address **ST4643196@GMAIL.COM** which included the following information:

    a. An email from TORRES dated September 25, 2019, with the SUBJECT: "Re: Rent Invoice". The body of the email read, "The original rent amount without discount is

8

$33,800 plus taxes equals a total monthly rent of $39,208. The the total 8- month rent is $313,664. Monthly rent with discount is $32,448plus tax $37,639.68. The total 8-month rent $301,117.44, (Discount of 4%) If you have any questions please call me.

   b. An email from TORRES dated September 26, 2019, with the SUBJECT: "ROUTER BILL AND CARPORT MODELS" and the body of the email said, "Please let me if you sent the $6,882.00 plus the $21,500 for the carport models. A total of $28,382.00Pesos Thank you." The CI stated TORRES was paid at the direction of CHAVEZ and ALL STEEL employee Michael BURTON via Banco Santander account x4147-9 through ALL STEEL controlled bank accounts an average amount of $2,300 per month.

   c. An email to TORRES dated September 26, 2019, with the SUBJECT: "Today's Wires". The email was addressed to Santiago TORRES at santiagot@allamericanbuildings.com and **ST4643196@GMAIL.COM**. The body of the email Hi Santiago, I am sending you US$815.40 to the Grupo Telecomunicado account this morning. I am also sending you US$2,300 today. Do you want me to send it to the same account or do you have a different account you want it to go to?" The CI stated TORRES set up three bank accounts in Mexico for Grupo Telecomunicado and TORRES was paid at the direction of CHAVEZ and ALL STEEL employee Michael BURTON through ALL STEEL controlled bank accounts an average amount of $2,300 per month.

**BACKGROUND CONCERNING EMAIL**

13. In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name gmail.com like the email accounts listed in Attachment A. Subscribers obtain an account by registering with Google. During the

9

registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

14. A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

15. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

16. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This

10

information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

17. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

18. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of

11

occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

19. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

12

## REQUEST FOR SEALING

20. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

_____
Brian Turk
Special Agent
Homeland Security Investigations

1:33 PM, Apr 14, 2020
Subscribed and sworn to before me on _____, 2020

Michael Newman
Michael J. Newman
United States Magistrate Judge

**Via electronic means.**

13

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with **ST4643196@GMAIL.COM** that is stored at premises controlled by Google, a company that accepts service of legal process at 1600 Amphitheater Parkway, Mountain View, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.**     **Information to be disclosed by Google (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    a.     The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

    b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.     The types of service utilized;

    d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

    e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations 8 U.S.C. § 1324(a)(1)(A)(v)(I) (conspiracy to harbor aliens and to encourage and induce illegal aliens to enter and reside in the United States); 8 U.S.C. § 1324(a)(3) (during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens); 18 U.S.C. § 1028A (aggravated identify theft during and in relation to a violation of the Immigration and Nationality Act, 8 U.S.C. § 1321 *et seq.*); 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) involving Ignacio CHAVEZ-CASTILLO, Santiago TORRES-Ibarra, and others since January 2018 through the present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Efforts to solicit, hire, or recruit aliens to work illegally in the United States;

(b) Efforts to transport aliens from Mexico into the United States in a manner that avoids immigration check points or border crossings;

(c) Fees, payments, expenses, or funds used for the transport of aliens from Mexico into the United States in a manner that avoids immigration check points or border crossings;

(d) Discussions, conversations, or communications concerning or reflecting aliens illegally working for ALL STEEL in the United States;

(e) Discussions, conversations, or communications concerning or reflecting funds sent from CHAVEZ-CASTILLO, ALL AMERICAN, or ALL STEEL to Mexico, including, but not limited to: payments to Santiago TORRES-Ibarra or other ALL STEEL employees in that country;

2

(f) Discussions, conversations, or communications concerning or reflecting the acquisition, purchase or rental of real estate by CHAVEZ-CASTILLO, ALL AMERICAN, ALL STEEL, or Santiago TORRES-Ibarra;

(g) Discussions, conversations, or communications concerning ALL STEEL, including, but not limited to, the identity of current or former employees, corporate profits, or efforts to evade or avoid immigration laws.

(h) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(i) The identity of the person(s) who communicated with the user ID about matters relating to ALL STEEL and its harboring, transport, and employment of illegal aliens, including records that help reveal their whereabouts.

## ATTACHMENT C

8 U.S.C. § 1324(a)(1)(A)(v)(I) (conspiracy to harbor aliens and to encourage and induce illegal aliens to enter and reside in the United States);

8 U.S.C. § 1324(a)(3) (during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens);

18 U.S.C. § 1028A (aggravated identify theft during and in relation to a violation of the Immigration and Nationality Act, 8 U.S.C. § 1321 *et seq.*);

18 U.S.C. § 1956(h) (conspiracy to commit money laundering)

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Google and my official title is _____. I am a custodian of records for Google. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Google and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.     such records were kept in the ordinary course of a regularly conducted business activity of Google; and

    c.     such records were made by Google as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____      _____
Date                                                 Signature